**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| BOSTON DENTAL GROUP, LLC, <br><br> Plaintiff, <br><br> v. <br><br> AFFORDABLE CARE, LLC, <br><br> Defendant. | Case No. 2:16-cv-01636-RFB-CWH <br><br> **<u>ORDER</u>** <br><br> Plaintiff's Motions for Partial Summary Judgment (ECF Nos. 34, 35, 37) <br><br> Defendant's Motion for Summary Judgment (ECF No. 38) |

**I. INTRODUCTION**

Before the Court are Plaintiff / Counterdefendant Boston Dental Group, LLC ("BDG")'s Motion for Partial Summary Judgment (Unlawful use), (ECF No. 34); Plaintiff's Motion for Summary Judgment (Naked Licensing), (ECF No. 35); Plaintiff's Motion for Summary Judgment (Laches), (ECF No. 37); and Defendant / Counterclaimant Affordable Care, LLC ("AC")'s Motion for Partial Summary Judgment, (ECF No. 38).

**II. PROCEDURAL BACKGROUND**

On July 12, 2016, BDG filed its Complaint against AC. (ECF No. 1). AC filed an Answer and Counterclaim on September 12, 2016. (ECF No. 5). BDG filed an Answer to the Counterclaim on September 27, 2016. (ECF No. 10).

On June 30, 2017, BDG filed the instant Motion for Partial Summary Judgment on the issue of unlawful use, a Motion for Summary Judgment on the issue of naked licensing, and a Motion for Summary Judgment on the issue of laches. (ECF Nos. 34, 35 & 37). AC filed a Motion for Partial Summary Judgment on the same day. (ECF No. 38). BDG filed its Response to AC's

Motion on August 4, 2017. (ECF No. 46). AC also filed its Responses to BDG's Motions on August 4, 2017. (ECF Nos. 53, 54, 55). AC filed its Reply to its Motion for Summary Judgment on August 25, 2017. (ECF No. 62). The same day, BDG filed Replies to its Motions. (ECF Nos. 64, 65, 66).

### III. LEGAL STANDARD

#### A. Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (quotation marks omitted).

### IV. UNDISPUTED FACTS

The Court finds the following facts to be undisputed. BDG is a limited liability company owned by Dr. David Ting ("Dr. Ting"). (Ting Decl., ECF No. 34-1 at 2). In 2007, Dr. Ting and BDG began to promote the opening of a dental office called Affordable Dental in Las Vegas, Nevada. (Id.) The office opened for business in January 2008. (Id.). AC is a dental support organization ("DSO") that provides a variety of non-clinical services, including billing, purchasing, financing, marketing, assistance with securing legal services, and advertising services to its affiliated dental practices ("Affiliates"). (Steelman Decl., ECF No. 86-3 at 3). AC has one

Affiliate dental practice in Nevada, located in Las Vegas ("Vegas Affiliate"). (Id. at 4). The Vegas Affiliate opened its doors for customers in 2007, and has remained open through the present. (Id.).

Both parties have trademarks that they license to dental practices or dental offices. In November 2000, Affordable Care applied to register the AFFORDABLE DENTURES mark on the Patent & Trademark Office ("PTO")'s Principal Register. (Affordable Dentures PTO Page, ECF No. 86-9 at 2). In March 2002, AC's AFFORDABLE DENTURES mark was granted registration on the Principal Register for "dental services" under Reg. No. 2,546,707. (List of AC Trademark Registrations, ECF No. 86-2 at 4). AC's federal registration for the AFFORDABLE DENTURES mark is based on a first use in commerce of 1977. (Id.). AC owns federal trademark registrations on the Principal Register for a family of additional AFFORDABLE-formative marks used in connection with dental services (collectively, and inclusive of the AFFORDABLE DENTURES mark, the "AC Marks") (Id. at 3-12). AC licenses the AC Marks to more than 230 Affiliates to be used in connection with the provision of dental services, including dentures. (ECF No. 86-3 at 4).

On August 21, 2012, BDG filed U.S. Trademark Application No. 85,709,476 to register the mark AFFORDABLE DENTAL for "dentist services; oral surgery and dental implant services; orthodontic services; providing cancer screening services; [and] teeth whitening services." (Affordable Dental PTO Page, ECF No. 86-10 at 2). On December 19, 2012, the PTO denied registration based upon likelihood of confusion with AC's AFFORDABLE DENTURES mark. On March 7, 2013, the PTO suspended action on BDG's application, in part because it found BDG's arguments unpersuasive with regard to the prior "likelihood of confusion" refusal to registration on the Principal Register. (PTO Suspension Letter, ECF. 86-19 at 2). BDG's AFFORDABLE DENTAL application was subsequently amended and allowed to register on the Supplemental Register on January 6, 2015, Reg. No. 4,668,829. (ECF No. 86-10 at 2).

### A. Facts Regarding Unlawful Use

AC has over 230 Affiliates nationwide. (ECF No. 86-3 at 3). In addition to other fees, AC charges its Affiliates a general management fee ("Management Fee"). (Id.). Nevada is a state that prohibit DSOs from charging a fee based on the net profit or net operating margin of the dental

practices ("Percentage-Based Fee"); AC charges its Affiliates in states like Nevada a fixed fee ("Fixed Fee"). (Id. at 4). Regardless of whether an Affiliate is located in a state that allows or forbids fees based on the net profit or net operating margin of the dental practices, AC does not ask its Affiliates to pay a Management Fee until after the Affiliate begins to earn a profit. (Id.).

Since 2007, AC has provided services to the Vegas Affiliate. (Id.). On October 25, 2007, AC and the Vegas Affiliate entered into a service contract (the "2007 Service Contract"). (ECF No. 86-4). The 2007 Service Contract includes a summary of management fees, which summary lists a "Central Office Service Fee" as a Fixed Fee and lists a Management Fee as a Percentage-Based Fee. (ECF No. 86-4 at 20). Section VI(H) of the 2007 Service Contract, titled "Waiver of Performance," provides that if any act or service of AC under the Agreement "should be construed or deemed by any government authority, agency or court to constitute the practice of dentistry, the performance of said act or service by [AC] shall be deemed waived and forever unenforceable. . . ." (Id. at 10). Financial documents from between 2013 and 2016 show that AC charged the Vegas Affiliate a fixed Management Fee. (Fee Statements, ECF No. 86-6).

### B. Facts Regarding Naked Licensing

#### i. AC's Role As A DSO

DSOs provide affiliate dentists and dental practices with a variety of non-clinical services, including billing, purchasing, financing, marketing, assistance with securing legal services, and advertising services. (Bileca Decl., ECF No. 38-4 at 3). AC is a member of the Association of Dental Support Organizations ("ADSO"). (Id. at 5). DSOs are recognized by and permitted to operate under the laws of all 50 states. (Id. at 3). Members of the ADSO operate in 44 states and support more than 13,000 dentists worldwide. (Id.). DSOs typically license their marks to provide affiliates with a common brand identity, and most DSO-affiliates practice under marks owned by their DSO. (Id. at 5). As a DSO, AC recruits dentists to become practice owners of dental practices that affiliate with AC. (Siegal Depo., ECF No. 38-15 at 3).

#### ii. License Provisions Governing The Vegas Affiliate

AC provides similar services to all of its Affiliates using the AFFORDABLE DENTURES mark and related AC Marks, with small variability due to the individual practice owners ("POs").

(Siegal Depo., ECF No. 38-15 at 10). AC enters into oral trademark licenses with each of its Affiliates, which allow the Affiliates to use the AC Marks. (ECF No. 87-3 at 3). The right to use the AC Marks is concurrent with and dependent upon affiliation with AC. (Id.). Additionally, as a condition of the oral license, each Affiliate enters into a service contract and facility lease with AC. (Id. at 4). The Vegas Affiliate entered into a Service Contract ("Vegas Contract") and building lease ("Vegas Lease") with AC. (ECF No. 38-3 at A-1 and A-2). The current Vegas Contract and Vegas Lease were entered between AC and the Vegas Affiliate on January 1, 2016. (Id.).

The Vegas Affiliate is wholly owned by PO Dr. Cher Chang ("Dr. Chang"). (ECF No. 38-3 at A-1). Dr. Chang is licensed to practice dentistry in the state of Nevada. (Id.). Dr. Chang opened the Vegas Affiliate under the AFFORDABLE DENTURES name at the end of 2007. ECF No. 66-22 at 3). Dr. Chang controls the clinical practice of her office; under the terms of the Service Contract, AC cannot direct, control, or interfere with Dr. Chang's independent professional judgment over clinical matters. (ECF No. 38-3 at A-1). AC provides the Vegas Affiliate with "business and administrative services . . . to support the management of the business aspects of the [Affiliate]" and supplies an on-site dentures laboratory. (Id.).

Further, the Vegas Contract requires "that each dentist and dental staff who works at the Dental Office comply . . . with the professional and ethical standards, requirements, laws and regulations applicable to their professions under federal law and the law of the State (including, without limitation, OSHA, HIPAA, and workplace safety laws)." (Id.). When disciplinary complaints, professional malpractice, or other actions are initiated against any dentist or dental staff the Affiliate is required under the terms of the contract to immediately "inform AC of the action, and the underlying facts and circumstances." (Id.). The Vegas Contract also requires the Affiliate to "maintain comprehensive professional liability insurance" with minimum limits per claim and policy and provide AC with proof of coverage. (Id.). The Vegas Contract requirements regarding compliance with law, informing AC of actions initiated against the practice's staff, and liability insurance are present in all Affiliate service contracts. (ECF No. 87-3 at 4).

The Vegas Affiliate leases its office directly from AC, which is responsible for supplying office space, furnishings, and dental equipment that meet AC's quality standards and that are

subject to the Affiliate's professional review and approval. (ECF No. 38-3 at A-2). AC explicitly retains the right to enter the Vegas Affiliate's premises at all reasonable times to examine the same. (Id.). Affordable Dentures Dental Lab ("ADDL"), a wholly owned subsidiary of AC, provides a dentures lab within the office of each of the Affiliates. (ECF No. 87-50 at 6). ADDL shares space with the Vegas Affiliate, pursuant to terms of the Vegas Lease. (ECF No. 38-3 at A-2).

Additionally, the Vegas Contract provides that AC shall work with the Vegas Affiliate to develop uniform business policy guidelines for the practice, identifying "financial, administrative, human resource, and marketing policies and procedures" to ensure the "orderly business operation" of the Affiliate. (ECF No. 38-3 at A-1). The Vegas Contract imposes written business policy guidelines of the Vegas Affiliate, including: hours of operation; minimum staffing; minimum dentist availability for patient emergencies; front desk staffing procedures; office schedules; invoice, payroll data, and accounting data submissions; payment policies; performance reviews; office maintenance and cleanliness; centralized purchasing; office dress code; lab relations; safety; patient concern resolution processes; and employee benefits. (ECF No. 383-3 at A-1, Ex. B). The Vegas Contract also requires the Vegas Affiliate to protect patient health information. (Id. at Ex. D).

While the Vegas Affiliate has sole authority over employee hiring, termination, performance reviews, and pay decisions, AC has the contractual authority to do the following: "maintain personnel records on behalf of the [Affiliate]"; "procure and administer employee benefit plans"; advise[ ] on staffing issues; assist[ ] with recruitment of employees; consult[ ] with the Affiliate on "performance reviews, appropriate pay levels, and benefits"; and on request, assist[ ] the Affiliate with employee relations issues." (ECF No. 38-3 at A-1). If the Vegas Affiliate needs temporary staffing, on request, AC helps screen and retain candidates, subject to the PO's approval. (ECF No. 87-50 at 9).

Under the terms of the Service Contract, AC may terminate an Affiliate if it does not satisfy the above requirements or otherwise meet AC's quality standards. (ECF No. 87-3 at 9). AC reserves the contractual right to immediately terminate the Affiliate "for cause" as set forth in the Contract. (ECF No. 38-3 at A-1). AC also reserves the right to terminate the Service Contract

without cause upon 90-days written notice. (Id.). The Vegas Contract explicitly prohibits the Vegas Affiliate and PO from using the AC Marks after the service contract ends. (Id.). All of the terms described above are contained in the leases and contracts AC enters with its other Affiliates. (ECF No. 87-3 at 4-6).

### iii. AC's Actual Efforts To Monitor Compliance And Quality

AC regularly monitors its Affiliates' adherence to the oral trademark license terms to ensure that the affiliates maintain AC's quality standards. (ECF No. 87-3 at 10). AC screens each potential PO before affiliation; before affiliation, a potential PO must interview with high-performing dentists in the AC network, observe the operations of affiliated AC practices, and interview with AC's Chief Executive Officer to make sure that the PO meets AC's quality standards. (ECF No. 87-3 at 6; ECF No. 87-49 at 3-4). After a PO is accepted for affiliation, but before the PO is allowed to provide goods and services under the AC Marks, the PO must complete an orientation and training about running a dental practice under the Affordable Dentures brand. (ECF No. 87-3 at 6). Dentists have no right to use the AC Marks until they successfully complete AC's on-boarding process. (Id.). In addition, regional Practice Operations Consultants ("POCs") communicate with each Affiliate multiple times each month. (2014 Regional Commc'ns POC Ryan, ECF No. 87-10). POCs also conduct visual inspections of the affiliated practices and their operations. (ECF No. 87-50 at 6).

With regard to patient concerns, AC regularly monitors patient satisfaction with both the clinical and non-clinical services provided by its Affiliates via a patient concern hotline and patient satisfaction surveys. (ECF No. 87-50 at 4). AC also has a "Patient Satisfaction" link accessible from each Affiliate's website where patients can submit concerns. (ECF No. 87-46 at 3). AC maintains a database of patient concerns and reaches out to POs about strategies for addressing those concerns. (ECF No. 87-3 at 9).

### C. Facts Regarding Laches

From 2008 until 2015 multiple other Affordable Dental locations were opened in Nevada and California, as part of BDG. (Id.). In connection with the BDG brand, Dr. Ting has opened or acquired over 20 dental practices in Nevada (the "BDG Network"). (BDG Webpage, ECF No. 56-

5 at 44-45). Within the BDG Network, the dental offices have a variety of names. Examples of office names in the BDG Network include: Discount Dental, Happy Dental, Reel Smiles Dental, Aliante Dental, Affordable Dental, and Hola Dental. (Id.) BDG's Affordable Dental offices are advertised to the public as BDG Locations and part of the BDG Network. (Id.).

At the time the first Affordable Dental office opened in 2008, there was an existing Affordable Dentures practice within 3.5 miles. (Ting Decl., ECF No. 37-1 at 2). One Affordable Dentures patient, Allen Jackson, declared that in December 2012, he noticed an Affordable Dental office near his home opening. (Jackson Decl., ECF No. 56-16 at 2). Jackson stated that until June 2013, he believed that the Affordable Dental office was actually an Affordable Dentures office. (Id.). Ms. Tammie Frazier, an employee of the Las Vegas Affordable Dentures practice stated that by July 2013, she "noticed a significant increase in calls from individuals confusing Dr. Chang's Affordable Dentures practice with that of Affordable Dental" beginning the two years prior. (ECF No. 37-4 at 2). Like all other AC Affiliates, the Vegas Affiliate is independently owned by practice owner and dentist Dr. Chang. (ECF No. 38-3 at A-1). The office staff at each Affiliate is employed by the Affiliate, not AC. (Chang Depo., ECF No. 59-6 at 3).

On March 5, 2013, the Vegas Affiliate practice owner, Dr. Chang, contacted regional AC representative Richard Ryan ("Ryan") to report calls from patients regarding apparent confusion between Affordable Dental and Affordable Dentures locations. (2013 Emails between Chang and Ryan, ECF No. 56-18 at 2-3). On March 20, 2013, AC sent BDG a cease and desist letter, requesting that BDG cease use of the AFFORDABLE DENTAL mark. (March 20, 2013 Cease and Desist Letter, ECF No. 56-13). On March 26, 2013, BDG responded, disputing a likelihood of confusion between the two marks and stating that BDG was not taking action on its federal application for the AFFORDABLE DENTAL mark at the time, as the application was suspended. (BDG Response Letter, ECF No. 56-15). On April 29, 2013, AC sent BDG a second cease and desist letter, stating that AC would pursue judicial intervention if necessary but that an out-of-court resolution was preferred. (April 2013 Cease and Desist Letter, ECF No. 56-14). In July 2013, a different potentially infringing trademark, AFFORDABLE DENTAL CARE (the "ADC Mark"), filed by a third party, was published for opposition on the PTO. (Slavic Decl., ECF No. 56-3 at 3).

AC initiated opposition proceedings before the Trademark Trial and Appeal Board ("TTAB") opposing the ADC Mark. (Id.). AC and the third party resolved the dispute in January 2015. (Id.). Between 2013 and 2015, AC also enforced its mark against a number of other potential third party infringers. (Id.).

On December 30, 2015, AC filed to cancel BDG's registration before the TTAB. (Id. at 4). Between AC's filing of the cancellation petition at the end of December 2015 and BDG's filing of this lawsuit in July 2016, the parties attempted to engage in settlement discussions which ultimately proved unsuccessful. (Id.). Attempts to engage in settlement after the filing of BDG's suit were also unsuccessful. (Id.).

## V. DISPUTED FACTS

With regard to the defense of laches, the parties dispute whether AC learned of Affordable Dental offices being open to the public prior to 2013.

## VI. DISCUSSION

### A. Unlawful use

Nevada Revised Statute ("NRS") § 631.215(2) provides in relevant part: "Nothing in this section [regulating the practice of dentistry]: . . .

> (h) Prohibits a person from providing goods or services for the support of the business of a dental practice, office or clinic owned or operated by a licensed dentist or any entity not prohibited from owning or operating a dental practice, office or clinic if the person does not:
> (1) Provide such goods or services in exchange for payments based on a percentage or share of revenues or profits of the dental practice, office or clinic; or
> (2) Exercise any authority or control over the clinical practice of dentistry."

NRS § 631.395 provides in relevant part: "A person is guilty of the illegal practice of dentistry or dental hygiene who: . . . (10) Except as otherwise provided in NRS 631.385 [permitting a family member to own or control a dental practice after the dentist's death], owns or controls a dental practice, shares in the fees received by a dentist or controls or attempts to control the services offered by a dentist if the person is not himself or herself licensed pursuant to this

- 9 -

chapter[.]"

The assertion of trademark priority may be stopped if the asserting registrant engages in unlawful use of a trademark. The inquiry for trademark priority "does not stop with use in commerce" – for one registrant to have trademark priority over the other, the trademark use must be lawful. CreAgri, Inc. v. USANA Health Scis., Inc., 474 F.3d 626, 630 (9th Cir. 2007). However, only material unlawful use may cause the loss of trademark protection. For unlawful use to be considered material, it must be "of such gravity and significance that the usage [of the mark] . . . as a matter of law, [can] create no trademark rights." S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 931 (9th Cir. 2014) (quoting CreAgri, 474 F.3d at 633) (quotation marks omitted). Additionally, "trademark protection might not be withheld on account of unlawful conduct that is 'collateral,' namely where there is an insufficient nexus between the unlawful behavior and the use of the mark in commerce." Id. (citing CreAgri, 474 F.3d at 631-33).

In its Motion for Summary Judgment, BDG argues that AC's contract with the Vegas Affiliate was illegal under Nevada law, and that the specific terms of the 2007 Service Contract constitute the illegal practice of dentistry in Nevada, as the Management Fees described in the Contract were based on the revenues and profits of the dental practice. In BDG's view, because this arrangement is illegal, the arrangement cannot form the basis of a right to trademark priority. BDG also contends that the unlawful use was also material, as it related directly to the arrangement between AC and its Affiliates regarding the services provided under the AFFORDABLE DENTURES brand.

In response, AC first argues that BDG's Motion should be dismissed as procedurally improper because BDG never pleaded trademark priority due to unlawful use as a claim or defense. Further, AC contends that BDG has failed to establish an unlawful use that would affect the priority of AC's prior use and incontestable registration of the AFFORDABLE DENTURES mark, as BDG does not show undisputed facts that AC engaged in the illegal practice of dentistry. AC additionally argues that, even if it did engage in unlawful conduct, BDG's mark would not be entitled to priority. AC claims it had prior use, in part because of its registration on the Principal Register and in part because the AFFORDABLE DENTURES mark is incontestable and entitled

to a presumption of validity. AC argues that its priority is not affected because there is no evidence of unlawful use that existed at the time priority was obtained. AC additionally contends that any unlawful use is immaterial and collateral, as a percentage-based fee would have no impact on consumers' perception of the services provided under the AFFORDABLE DENTURES brand. If any violation is found, it should be considered technical rather than material.

The Court first finds that the Motion for Summary Judgment is proper, and construes the unlawful use claim to be a defense to AC's assertions of trademark priority as well as part of the argument that AC's marks are unenforceable, which is consistent with the allegations made in the Complaint. With regard to the substantive analysis of the motion, the Court first notes that there is no evidence in the record of any legal determination that AC engaged in unlawful use at the time it registered the AFFORDABLE DENTURES mark. While it is true that the 2007 Service Contract provides for percentage-based management fees, the Court finds that there is no evidence in the record to indicate that AC actually collected a percentage-based fee from the Vegas Affiliate between 2007 and 2016. The Court does not find that the mere existence of a provision in the 2007 Service Contract, a standard national contract, is sufficient to establish unlawful use, particularly as the plain language of NRS § 361.215(h) appears to require actual profit-sharing, suggesting that the contractual reservation of right to a percentage alone would not necessarily violate law. Even if AC were engaging in unlawful use of its marks, the Court finds that use to be immaterial and collateral. The Court agrees with AC that there is an insufficient nexus between the allegedly unlawful conduct and the use of the AC marks. The Court is persuaded by the analogy AC draws to Zaffina, where the Ninth Circuit found that the alleged failure to pay corporate taxes was "misconduct . . . unrelated to the purpose of the federal trademark laws, and, therefore, collateral and immaterial." 762 F.3d at 931-32 (citation omitted).

For these reasons, Plaintiff's Motion for Summary Judgment on the issue of unlawful use is denied. The Court finds as a matter of law that unlawful use has not been established and that, even if there were such use in the context of payment arrangements, it is collateral and immaterial to use of the AFFORDABLE DENTURES mark.

**B. Naked licensing**

1    The parties submitted Cross-Motions for Summary Judgment on the issue of naked
2    licensing. The analysis below incorporates the arguments raised in both Motions.

3    Nevada law expressly limits the control a non-dentist may have over a dentist. NRS §
4    631.215 permits a non-dentist to provide goods and services to a dentist, or support the dentist's
5    business, provided the non-dentist does not exercise any authority or control over the dentist's
6    clinical practice. Nevada Administrative Code ("NAC") § 631.275(1)(a)–(o) provides a list of
7    activities considered exercising authority or control over the clinical elements of dentistry
8    practice, including controlling the manner of how dental equipment is to be used, the length of
9    time a dentist spends with a patient, or the delegation of duties from a dentist to a dental
10   hygienist.

11   A trademark owner that licenses its mark to a licensee has a duty to control the quality of
12   the mark. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 515 (9th Cir. 2010). When a
13   licensor does not observe this duty, and neglects to control the quality of licensee's use of the
14   mark, naked licensing occurs. Id. (citation omitted). The Ninth Circuit has held that "naked
15   licensing is '*inherently deceptive* and constitutes abandonment of any rights to the trademark by
16   the licensor.'" Id. at 516 (quoting Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc., 289 F.3d
17   589, 598 (9th Cir. 2002) (alteration in original). Once a court finds that the licensor has
18   abandoned its trademark, the licensor is estopped from asserting trademark rights. Id.

19   To decide whether a claim of naked licensing exists, the court must determine: (1)
20   whether the license included an "express contractual right to inspect and supervise" the
21   operations of the licensee; (2) whether the licensor maintained actual control over the licensee's
22   use of the mark; and (3) whether the licensor and licensee were involved in a "close working
23   relationship" such that quality control was established despite the lack of a formal agreement or
24   contract. Id. at 516-18. Importantly, "[t]he absence of an agreement with provisions restricting or
25   monitoring the quality of goods or services produced under a trademark supports a finding of
26   naked licensing." Id. at 516 (citations omitted). Furthermore, the reliance on a licensee's quality
27   control alone is insufficient to prevent a finding of naked licensing. Id. at 519. The purpose of
28   quality control is not to ensure that the licensed goods or services are of "high" quality, but rather

of equal quality. Barcamerica, 289 F.3d at 598 (citing McCarthy on Trademarks and Unfair Competition § 18:55, at 18–94 (4th ed. 2001)).

"[T]he proponent of a naked license theory of trademark abandonment must meet a 'stringent standard of proof.'" FreecycleSunnyvale, 626 F.3d at 514 (quoting Barcamerica at 596). The Ninth Circuit has not determined, however, whether this "stringent standard of proof" requires clear and convincing evidence, or alternatively a preponderance of the evidence. Id.

In its Motion, BDG contends that AC cannot have quality control over the practice of dentistry simply because AC cannot actually clinically supervise its Affiliates, as such an arrangement is prohibited by Nevada law. BDG argues that AC's inability to clinically supervise its Affiliates necessarily means that it cannot monitor and maintain a particular standard of quality as to the provision of dental services at its Affordable Dentures locations. It thus argues that AC has abandoned the trademark as a matter of law.

With regard to any contractual right to control the quality of its licensee's services, BDG argues that the terms of the license explicitly state that AC's oversight and authority does not extend to any activity that would constitute the practice of dentistry, and that the practice of dentistry is fully and exclusively reserved to the licensee. BDG cites to the Management Services Agreement between AC and the Vegas Affiliate. (ECF No. 35-3). BDG argues that AC did not exercise actual control over the dental services provided at the Affiliate locations, as it could not do so under the terms of the contract or by law. According to BDG, this lack of quality control is deceptive to the public. BDG also contends that AC lacks a close working relationship with its Affiliates.

AC argues that, whether the Court applies a clear and convincing standard, or a preponderance of the evidence standard, BDG cannot meet either stringent standard of proof. AC cites to Dr. Ting's deposition as the person most knowledgeable about BDG in support of its argument that BDG lacks any evidence of written documents that support its naked licensing claim. (Ting 30(b)(6) Depo., ECF No. 87-51 at 4).[1] AC contends that BDG's reference to the

---

[1] The deposition excerpt which AC attaches to its Motion appears to be a rough draft that is not certified by a court reporter.

- 13 -

Management Services Agreement does not show that AC lacks quality control, but rather that AC ensures its Affiliates' compliance with state laws. AC additionally argues that it maintains express contractual rights to inspect and supervise the quality of its Affiliates' practices, through its oral licenses.

Further, AC argues that it has actual control over its Affiliates through the exercise of express contractual rights. AC claims that, unlike the cases in which the Ninth Circuit found naked licensing, AC ensures consistent quality among its Affiliates by requiring all Affiliates to complete a screening and onboarding process, maintaining communication with Affiliates on a monthly basis via Practice Operations Consultants, and monitoring patient satisfaction through its hotline, website, and annual surveys. With regard to a close working relationship between AC and its Affiliates, AC points to the undisputed facts that ADDL labs are located on-site in every Affiliate practice, and that AC receives immediate notification from an Affiliate if it faces any disciplinary complaint or threat of malpractice.

The Court finds that BDG has not met a stringent standard of proof regarding naked licensing. BDG has not established that AC lacks contractual rights and procedures to maintain the quality of services at its Vegas Affiliate and other Affiliates. As the Ninth Circuit articulated in Barcamerica, the purpose of quality control is to ensure that customers obtain equal quality from all licensees of a mark. 289 F.3d at 598. The Court has examined the provisions of the contracts between AC and its Affiliates and finds that AC maintains express rights of control to a degree sufficient to ensure standardized quality among Affiliates. In addition, while AC does not engage in the clinical practice of dentistry, the undisputed facts show that it exercises actual control by providing onboarding to all Affiliates, maintaining an on-site laboratory to fabricate all dentures and apparatuses used by the Affiliate dentists, and terminating Affiliates that do not conform to AC's standards.  AC also monitors patients' and others' views of its affiliates through surveys and other tools to gather outside perspectives on its affiliates.  AC receives reports from consultants who review the actual practice of dentistry in the offices of its affiliates. These facts are significant in ensuring that all licensees of AC's marks conform to the same quality of care.

For these reasons, BDG fails to meet a stringent standard of proof, and summary judgment is granted in favor of AC. The Court finds as a matter of law that there was no naked licensing in this case.

### C. Laches

Laches is an equitable defense to "a party's right to bring suit, which is derived from the maxim that those who sleep on their rights, lose them." Eat Right Foods Ltd. v. Whole Foods Mkt., Inc., 880 F.3d 1109, 1115 (9th Cir. 2018) (citation and quotation marks omitted). The Lanham Act specifically provides for the defense of laches. 15 U.S.C. § 1115(b)(9); see also Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002) (citations omitted).

"[I]f a § 43(a) claim is filed within the analogous state limitations period, the strong presumption is that laches is inapplicable; if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." Jarrow Formulas, 304 F.3d at 837 (citations omitted). "[T]he presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period." Id. The limitations period begins at the time plaintiff knew or should have known of the alleged trademark infringement, and stops at the time the lawsuit is filed in which the laches defense is asserted. Eat Right Foods, 880 F.3d at 1116 (citation omitted). Constructive knowledge is sufficient to trigger the limitations period. Id.

The proponent of the laches defense must show (1) unreasonable delay and (2) prejudice resulting from the delay. Id. at 1115; see also Jarrow Formulas, 304 F.3d at 838. While the filing of the claim outside of the limitations period indicates unreasonable delay, the Ninth Circuit has also considered six factors in determining whether the defense of laches applies to an unwarranted delay: "(1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing the mark; (3) harm to senior user if relief denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by junior user because of senior user's delay." La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V., 762 F.3d 867, 878 (9th Cir. 2014) (quoting E-Systems, Inc. v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983)).

The proponent of laches must also demonstrate that it suffered prejudice as a result of the unreasonable delay. Id. To show prejudice, the proponent must demonstrate more than

expenditures incurred as a result of expansion, as the defense of laches "is meant to protect an infringer whose efforts have been aimed at 'build[ing] a valuable business *around its trademark*' and 'an important reliance *on the publicity of [its] mark*.'" Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc., 559 F.3d 985, 991-92 (9th Cir. 2009) (alteration in original) (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:12). A finding of prejudice requires the court to consider "whether, during plaintiff's delay in bringing suit, the infringer developed an identity as a business based on its mark." Id. at 992. There are two types of prejudice – expectations-based and evidentiary. Eat Right Foods, 880 F.3d at 1119. "Expectations-based prejudice exists where a defendant took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly. . . . Evidentiary prejudice exists where a plaintiff's delay has led to lost, stale, or degraded evidence, or witnesses whose memories have faded, or who have died." Id. at 1119-20 (citations and quotation marks omitted).

The parties agree that the most analogous state law claim to trademark infringement and unfair competition is the Nevada Deceptive Trade Practices Act ("NDTPA"). The statute of limitations for an NDTPA claim is four years. NRS § 11.190(2)(d).

BDG argues that AC's Counterclaims 1, 2, and 3 are barred by the affirmative defense of laches. With regard to unreasonable delay, BDG claims that AC waited nearly 8 years to file suit; AC should have been aware of Affordable Dental opening when it was only 3.5 miles from the Las Vegas Affordable Dentures location, based upon the Declaration of Tammi Frazier. (ECF No. 37-4). BDG also argues that the E-Systems factors support a finding of unreasonable delay. BDG also contends that it will suffer prejudice from AC's delayed filing of suit. BDG and its licensees have allegedly made massive investments in time, money, and effort to build the AFFORDABLE DENTAL brand, spanning 15 locations, in the eight years AC delayed filing its claims. If AC had enforced its rights in 2008, BDG would have conserved millions of dollars and spent the money building goodwill in a different name.

In response, AC argues that it brought its Counterclaim within the four-year NDTPA statute of limitations. AC contends that it did not have actual knowledge of likely confusion until March 5, 2013, when Dr. Chang contacted AC about consumer confusion between Affordable

Dental and Affordable Dentures offices. AC argues that it would not have had constructive knowledge until August 21, 2012, when BDG filed its application to register the AFFORDABLE DENTAL mark with the PTO. In AC's view, even if AC knew of Affordable Dental's opening, the laches period would not be triggered, as the laches period only begins when the plaintiff asserting infringement knew or should have known about the likelihood of confusion. Additionally, AC argues that the presumptive laches period tolled on December 30, 2015, when AC initiated legal action against BDG before the TTAB. Those administrative proceedings and related settlement negotiations continued through the date AC filed its Counterclaim on September 12, 2016. The proceedings put BDG on notice that AC was protesting use of the Affordable Dental mark and that AC was potentially planning to escalate to federal court. AC further argues that the E-Systems factors are in its favor, and that BDG does not show prejudice as the record does not support BDG's claim that it spent millions of dollars on expanding from one location to fifteen. AC posits that, rather than building the AFFORDABLE DENTAL brand, BDG has built the umbrella BDG brand by adding dental practices to its Network with names such as Discount Dental, Happy Dental, Hola Dental, Reel Smiles Dental, Aliante Dental, as well as Affordable Dental.

The Court finds AC did not act with unreasonable delay. It is undisputed that BDG filed its application for trademark registration in August 2012. The Court finds that AC would have had constructive notice of the likelihood of confusion at that time but not before. Therefore, the four-year statute of limitation began to run on August 21, 2012, and the presumption of laches would be triggered as of August 21, 2016. The Counterclaims were not filed until September 12, 2016. However, the Court finds reason to toll the limitations period from at least December 30, 2015 until the filing of the counterclaims on September 12, 2016, based upon TTAB proceedings and settlement discussions before and after the filing of this lawsuit. See Eat Right Foods. 880 F.3d at 1117 ("Reasonable justifications for a delay include exhausting remedies through administrative processes, evaluating and preparing complicated claims, and determining 'whether the scope of proposed infringement will justify the cost of litigation.'") (citation omitted); see also Toyota Motor Sales, 610 F.3d at 1183 (excusing delay in part because parties attempted to resolve the

matter out of court). There would also be an earlier period of tolling, between two to three months in March and April of 2013 as AC sought dissuade BDG from using its mark.

The Court further finds that the record does not support a finding that AC became aware of the likelihood of confusion earlier based upon the intermittent observation of a receptionist in the Vegas Affiliate. Although Ms. Frazier declared in 2013 that she noticed an increase in customer confusion between Affordable Dentures and Affordable Dental locations over the prior two years, the Court does not find that the record supports an inference that Ms. Frazier or any other employee of the Las Vegas Affordable Dentures office communicated that confusion to AC. Therefore, the Court finds that AC did not have actual or constructive knowledge of its likelihood of confusion claim until August 21, 2012.

The Court also considers the E-Systems factors and finds that the test weighs in favor of AC given the length of time its mark has been registered and AC's prompt enforcement efforts beginning in March 2013 when it received actual knowledge of likelihood of confusion.

The Court finds that even if BDG could establish unreasonable delay, there was no prejudice. BDG's arguments only give rise to a possible claim of expectations-based prejudice; no evidentiary prejudice is alleged. The evidence does not show that BDG invested significant resources in building the AFFORDABLE DENTAL brand, such that that particular brand – as opposed to the overall BDG brand – was prejudiced by AC's delay in filing suit.  BDG has not presented any documentary or financial evidence establishing that it spent substantial resources marketing or developing its Affordable Dental locations.  Therefore, BDG's motion for summary judgment on the defense of laches is denied.  The Court finds as a matter of law that the laches defense does not apply to AC's Counterclaims.

**VII. CONCLUSION**

Accordingly,

**IT IS ORDERED** that Plaintiff / Counterdefendant's Partial Motion for Summary Judgment (ECF No. 34) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff / Counterdefendant's Motion for Summary Judgment (ECF No. 35) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff / Counterdefendant's Motion for Summary Judgment (ECF No. 37) is DENIED.

**IT IS FURTHER ORDERED** that Defendant / Counterclaimant's Partial Motion for Summary Judgment (ECF No. 38) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff / Counterdefendant's Motion for Summary Judgment (ECF No. 39) is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that Plaintiff / Counterdefendant's Motion for Summary Judgment (ECF No. 40) is DENIED AS MOOT.

**IT IS FURTHER ORDERED** the parties are directed to submit a Joint Pretrial Order by April 26, 2018.

**DATED** this 29th day of March, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**